IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 4, 2025 Session

## STATE OF TENNESSEE v. TONY THOMAS

**Appeal from the Criminal Court for Shelby County**
**No. 16-04531[1]      Lee V. Coffee, Judge**

_____

## No. W2023-01346-CCA-R3-CD

_____

Defendant appeals his Shelby County Criminal Court jury conviction of aggravated rape, challenging the sufficiency of the convicting evidence and arguing that the trial court should have dismissed the indictment based on either pre-indictment delay or the failure to follow the mandates of Tennessee Rule of Criminal Procedure 5, that post-indictment delay deprived him of the right to a speedy trial, that the trial court erred by refusing to grant a mistrial following the victim's in-court outburst, that the trial court violated his right to counsel, and that the trial judge should have recused himself. Upon review, we discern no error, and, accordingly, affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and JOHN W. CAMPBELL, SR., JJ., joined.

Tony Thomas, Whiteville, Tennessee, pro se (at trial and on appeal); Patrick Stegall, Memphis, Tennessee (advisory counsel).[2]

_____

[1] Many of Defendant's pleadings and some of the transcripts in the record bear additional case numbers. This appeal, however, concerns only those proceedings relevant to Defendant's conviction for aggravated rape in case number 16-04531.

[2] Defendant was at various points represented by other attorneys both in the trial court and on appeal. Mr. Stegall acted as advisory counsel during Defendant's trial, sentencing hearing, and motion for new trial hearing. Although the trial court initially appointed counsel to represent Defendant in this appeal, Defendant indicated a desire to represent himself, and following a hearing to determine whether his waiver of counsel on appeal was voluntary, Defendant was permitted to represent himself in this court.

Jonathan Skrmetti, Attorney General and Reporter; J. Katie Neff, Assistant Attorney General; Steven J. Mulroy, District Attorney General;[3] and Dru Carpenter and Brittany Neal, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The procedural history, and thus the record, in this case is as complicated as the facts are simple. In 2016, following the forensic analyses of thousands of previously untested sexual assault kits collected by the Memphis Police Department ("MPD") during the intervening decades, the Shelby County Grand Jury returned an indictment charging Defendant with the April 2005 aggravated rape of the victim.[4] Extensive pretrial proceedings followed the indictment, including more than a dozen motions filed by Defendant, acting pro se, and by his appointed counsel, in this and two unrelated cases pending against Defendant, one in a pretrial posture and one involving a petition for post-conviction relief.[5] Most of the pleadings bear all three case numbers, regardless of the case to which their actual content applies. Defendant sought recusal of the trial judge and appealed to this court more than once seeking review of the trial court's rulings.[6] The pause in court proceedings occasioned by the COVID-19 pandemic caused further delay.

---

[3] Amy P. Weirich was the Shelby County District Attorney General in 2016 when proceedings against Defendant were initiated.

[4] In keeping with the policy of this court, we do not identify the victim by her name.

[5] In case number 08-07876, a Shelby County jury convicted Defendant, who was originally charged with aggravated rape, of one count of aggravated sexual battery, and this court affirmed the conviction and accompanying Range III sentence of twenty years' incarceration. *See State v. Thomas*, No. W2012-CCA-R3-CD, (Tenn. Crim. App. Sept. 6, 2013), *perm. app. denied* (Tenn. Jan. 14, 2014). The trial court later denied post-conviction relief, and this court affirmed. *See Thomas v. State*, No. W2022-00851-CCA-R3-PC (Tenn. Crim. App. July 19, 2023), *perm. app. denied* (Tenn. Oct. 25, 2024). In case number 16-0600, Defendant was charged with one count of aggravated rape, and the State dismissed case number 16-0600 following Defendant's conviction in this case.

[6] *See Thomas v. State*, No. W2023-00769-CCA-T10B-CO (Tenn. Crim. App. May 31, 2023) (Order), *perm. app. denied* (Tenn. June 22, 2023) [hereinafter *Thomas 10B Order*] (denying Defendant's petition for accelerated interlocutory appeal of the trial court's denial of the motion to recuse filed on February 15, 2023, and noting that "[i]t is unclear" to which of Defendant's cases the recusal matter related); *State v. Thomas*, No. W2022-00107-CCA-R3-CD (Tenn. Crim. App. Apr. 8, 2022) (Order) (dismissing Defendant's Rule 3 appeal of the trial court's order denying his motion to dismiss because the order was not a final judgment). Defendant filed a pro se pleading styled as a request for a Rule 9 interlocutory appeal of the trial court's order denying his motion to dismiss, but no disposition of this pleading, which did not comply with the requirements of Rule 9, appears in the record, and Defendant made no Rule 9 application for permission to appeal to this court. *See* Tenn. R. App. P. 9.

- 2 -

Eventually, the case proceeded to trial in June 2023. A Shelby County Criminal Court Jury convicted Defendant as charged, and this appeal followed.

**Factual and Procedural History**

The July 2016 indictment alleged that between April 12 and April 15, 2005, Defendant raped the victim and caused her bodily injury. Defendant, who was previously in custody on an unrelated case, was arrested on these charges on August 29, 2016, and the trial court appointed attorney Monica Timmerman to represent him on September 2, 2016. Despite that he was represented by counsel, on January 23, 2017, Defendant filed pro se a motion demanding a speedy trial. On April 27, 2017, Ms. Timmerman filed a motion to dismiss the case based upon the pre-indictment delay. On January 3, 2018, the trial court permitted Ms. Timmerman to withdraw and, on February 2, 2018, appointed Mr. Stegall to represent Defendant.

In February 2019, the State responded to the motions to dismiss.[7] In July, Defendant filed a pro se "supplement" to the previously filed motion to dismiss.[8] Then, in September of that same year, Defendant filed a pro se motion to dismiss based on perceived defects in the composition and operation of the Shelby County Grand Jury.

In addition to myriad motions to dismiss, in July 2019, Defendant filed a pro se motion asking the trial judge to recuse himself. The trial court held a hearing on the motion to recuse on October 30, 2019, but Defendant did not present any evidence and argued only that the court was biased against him and in favor of the district attorney general and that the court continued to "force" unwanted appointed counsel on him. The trial court deemed the motion to recuse "unverified, wholly speculative, and unsupported by any factual proof" and denied the motion based upon the absence of any evidence to support Defendant's claims. The court observed that Defendant was "a serial complainer" who

---

[7] This pleading is styled "Amended Response to Motion to Dismiss," but no original response appears in the record, and none is incorporated by reference into the "amended" response. It is not clear from the content of the pleading whether it is indeed an amendment or whether there is merely a mistake in the style.

[8] It is unclear which motion to dismiss this pleading is intended to supplement.

had already requested the removal of five different attorneys and the recusal of two different trial judges in his three pending cases.[9]

In addition to asking the trial judge to recuse himself, Defendant demanded that the trial court remove Mr. Stegall and appoint a different attorney. The trial court observed that Defendant had previously asked to represent himself in his pending post-conviction proceeding in 2018 and that the court had allowed him to do so. Defendant agreed that he had, at various points in the litigation in this case, asked to represent himself without any assistance of counsel, asked to represent himself with the assistance of Mr. Stegall as advisory counsel, and informed the court that he wanted Mr. Stegall "to handle" the proceedings for him. After questioning Defendant, the trial court concluded that Defendant had made "a knowing and voluntary decision to waive your rights to counsel." The court ruled that Defendant would be permitted to proceed pro se with Mr. Stegall acting as advisory counsel.

At the conclusion of the hearing on the recusal motion, the trial court warned Defendant that the time had come to hold an evidentiary hearing on Defendant's motions to dismiss and that if he "insist[s] that he is yet again not ready, or refuses to proceed on his motion and petition,[10] the [c]ourt will in fact dismiss these issues." Despite the court's warning, Defendant filed three more pro se motions to dismiss the indictment in January and February 2020, relying on the same grounds previously identified.

The trial court denied the motions to dismiss orally following a hearing on January 18, 2022, and, on February 15, 2022, entered a written order denying the same. Before the court entered its written order, Defendant attempted to appeal the court's ruling via Tennessee Rule of Appellate Procedure 3, but this court dismissed the appeal. *See Thomas 10B Order*. One week after entry of the trial court's written order, Defendant moved the

---

[9] Judge Chris Craft granted Defendant's request that he recuse himself from hearing Defendant's then-pending petition for post-conviction relief, and that case was reassigned to Judge Lee V. Coffee, who then presided over all three cases pending against Defendant for the duration of proceedings. Some of the attorneys to which Judge Coffee referred were originally appointed and removed by Judge Craft. A quick review of Defendant's filings in this court alone establishes that he has been represented by at least seven different appointed attorneys. *See Harris v. State*, 301 S.W.3d 141, 147 n.4 (Tenn. 2010) (noting that an appellate court may take judicial notice of its own records).

[10] This is a reference to the pending petition for post-conviction relief.

- 4 -

trial court pursuant to Tennessee Rule of Appellate Procedure 9 for permission to pursue an interlocutory appeal of the trial court's order.[11]

Defendant filed three more motions to dismiss the indictment: one based on the failure of the affidavit of complaint to state facts sufficient to support the finding of probable cause[12] and two based on delay in the case. The trial court denied these motions on the first day of trial.

The trial began on June 20, 2023, and lasted three days, although the proof took less than a day. Defendant represented himself, and Mr. Stegall acted as advisory counsel.

At trial, the victim testified that in April 2005, she "had just had a complete hysterectomy" that led her to relapse into using her "drug of choice," crack cocaine. On April 12, 2005, she was in the middle of "a binge" when she went to see her friend Marlo. At some point, Defendant arrived. The victim said that she had previously purchased drugs from Defendant and, at that time, knew him only as "Bathhouse Tony." She denied having had a romantic or sexual relationship with Defendant at any point and said that they had never engaged in consensual sex. She stated that she "just wanted to smoke crack" and that she "was not in my right state of mind" when she left Marlo's house with Defendant looking for more drugs to consume.

The victim agreed to drive Defendant to a house on Bellevue in Memphis and, on the way, they "went to a couple of stores" where, at Defendant's behest, she "wrote checks for over the amount" and "was getting money and beer." When they arrived at the Bellevue house, they went inside, where Defendant "started using his own product," "smoking primos,"[13] and "drinking." The victim said that Defendant "turned into somebody that I had never seen before."

---

[11] As indicated, no disposition for this motion appears in the record on appeal, and no Rule 9 appeal was initiated in this court. *See Harris*, 301 S.W.3d at 147 n.4.

[12] Notably, Defendant's case originated with the indictment rather than an arrest warrant predicated upon an affidavit of complaint. *See* Tenn. Code Ann. § 40-2-104 ("A prosecution is commenced, within the meaning of this chapter, by finding an indictment or presentment, the issuing of a warrant . . . .").

[13] The victim clarified that a "primo" is a marijuana joint laced with crack cocaine.

The victim described Defendant as "very intimidating" and said she "was very scared . . . to do anything other than what I thought he wanted." The Defendant held her against her will, showed her "pictures of him being a gangster," climbed on top of her, and took her keys and necklace from her. Defendant struck the victim and threatened to burn her with a crack pipe before he "raped me vaginally and anally." She said that she did not consent to either form of penetration and that she was in indescribable pain during the attack.

After Defendant "passed out on" top of her, the victim crawled from beneath him, found her keys, ran naked to her vehicle, and drove directly to the home of her oldest son's father. She stayed there overnight and then "went to Rape Crisis," where she underwent a physical examination that included the taking of photographs and the collection of a sexual assault kit. The victim identified herself in photographs taken during the examination.

In 2015, Lieutenant Samuel McMinn from MPD[14] contacted the victim with an update on her case. She told him that she wanted to proceed with the case and agreed that she would be willing to testify at trial. She said that she was "grateful that they finally contacted me." The victim provided a statement describing the offense and viewed a photographic lineup from which she identified Defendant as "Bathhouse Tony."

During a contentious cross-examination by Defendant, the victim agreed that she told Lt. McMinn that Defendant had assaulted her several times but that she "was too scared to report it." She acknowledged that she did not call 911 and chose to wait until morning to seek help. When Defendant asked her to "explain to the jury [the] other sexual assaults that I did," the victim said that she could not recall the number or date of the other assaults because they were too numerous to count.

She agreed that she told the police that Defendant had beaten her with his fists and a coat hanger and that he had burned her with a crack pipe. She reiterated that Defendant forced her to drive to Walmart and "write checks for over the amount" and that he "made me go to Circle K, across the street from Walmart, and write a check for over the amount after I bought a carton of cigarettes." She said that she did not ask for help at Walmart because she was "scared to death of you, if I didn't do what you said, you would hurt me."

---

[14] Lieutenant McMinn was a sergeant when he initially contacted the victim but had achieved the rank of lieutenant by the time of trial.

She said that Defendant told her to "drive back to that house, that shack across the street from your mother's house on Bellevue."

The victim vehemently denied that she and Defendant had ever been friends, saying, "You were my crack supplier. That's all you were." She also denied having sex with Defendant in exchange for crack.

The victim said that she did not go back to speak with investigators because she was "scared of" Defendant. She admitted that she did not contact the police at any point thereafter, saying to Defendant, "I thought you had just gotten away with it."

MPD Officer Joseph Byers responded to the sexual assault call at Regional Medical Center on April 14, 2005. While at the hospital, he took information from the victim and then "took her to the Sexual Assault Resource Center for an examination." He stayed with the victim until an officer from the Sex Crimes Bureau arrived but had no further involvement in the case.

Retired MPD Sergeant Qwendolyn Terry-Cook was working in the Sex Crimes unit on April 14, 2005, when she went to the Rape Crisis Center to interview the victim. After taking the victim's statement, Sergeant Terry-Cook "rode by the location of the occurrence" and then went to her office to prepare her report. She reached out to the victim and made an appointment for her to come in and give a written statement, but on the day of the appointment, the victim "had some type of crisis happen" and asked to reschedule. Thereafter, they lost touch, and Sergeant Terry-Cook was unable to contact the victim again. A couple of months later, she closed the case.

Retired nurse Judy Pinson, who examined the victim at the Rape Crisis Center in April 2005, testified that the victim told her that she was doing drugs at a friend's house when "Tony" arrived. The victim told Ms. Pinson that she agreed to drive Tony home and "went into the house to use the bathroom." The victim said that Tony "began acting crazy." The victim said Tony "pulled her hair out in clumps," and "hit her on the face with his fist," before holding "her around the trunk to keep her from running away." The victim said that Tony "penetrated her vaginally and anally."

Ms. Pinson said that the victim, who complained of back pain and a headache, "was crying, and she appeared to be sad." Ms. Pinson recalled that the victim "had scattered bruises on both arms" that Ms. Pinson documented in photographs that were exhibited to

her testimony.  Ms. Pinson "noticed that there was some redness at the entrance" of the victim's vagina but did not note any genital injuries.  She explained that such a finding was not unusual, saying, "It's more common to not find an injury in that area . . . than it is to find an injury."  Ms. Pinson "took swabs from the [victim's] vagina" as well as from her "anal area and from the external genitalia."  Those swabs were given to the MPD.

Cellmark Forensics DNA Analyst Aimee Rogers Grimaldi tested the swabs from the victim's sexual assault kit in 2015 and determined that the DNA profile extracted from the sperm fraction "originated from an unknown male."  Ms. Grimaldi created a DNA profile and forwarded her results to the MPD.  She was not asked to identify the unknown male contributor.

Lieutenant McMinn testified that in 2015, he and other officers of the DNA Unit were tasked with working through "the backlog of untested sexual assault kits."  After reviewing the case file, he contacted the victim, who said that she wanted to move forward.  He entered the DNA profile obtained by Ms. Rogers Grimaldi into "the CODIS database" in hopes of finding "an individual's information" that matched "the DNA found in the kit."  The database identified Defendant as the contributor of the unknown male DNA profile in this case, so Lt. McMinn created a photographic array that included Defendant's photograph to present to the victim.  He said that the victim identified Defendant as the perpetrator in "less than a minute."  Thereafter, Lt. McMinn located Defendant and obtained a search warrant to collect DNA swabs from him that he then sent for forensic testing.

DNA Analyst Stephanie Hickey received the "reference standard" from Defendant and used it to develop a DNA profile for Defendant.  Ms. Hickey compared Defendant's DNA profile with the DNA profile for the unknown male profile from the victim's sexual assault kit and determined that Defendant's DNA profile matched that of the unknown male.

After the State rested, Defendant elected not to testify and chose to present no proof.  Following a sentencing hearing, the trial court imposed a Range I sentence of twenty-five years' incarceration to be served at 100 percent by operation of law and ordered Defendant to serve the sentence consecutively to the twenty-year sentence imposed in case number 08-07876.  Defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

**Analysis**

In this appeal, Defendant asserts that the evidence adduced at trial was insufficient to support his conviction. He also argues that the trial court erred by refusing to dismiss the indictment based on both the pre- and post-indictment delay in his case; by refusing to appoint new counsel; by refusing to grant his motion to recuse; and by refusing to grant a mistrial following the victim's outburst at the conclusion of her direct examination. We consider each claim.

I. Waiver

As an initial matter, we note that the State argues that some of Defendant's issues and argument have not been properly preserved because they were raised in pleadings filed pro se by Defendant when he was also represented by counsel. A criminal defendant has a right to be represented by counsel *or* to represent himself and proceed pro se without the assistance of counsel. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 9; *Faretta v. California*, 422 U.S. 806, 819 (1975); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984). "[T]he right of self-representation and the right to counsel are alternative rights. In any particular proceeding, a person may assert one or the other, but not both." *Lovin v. State*, 286 S.W.3d 275, 284 (Tenn. 2009) (citing *State v. Berry*, 141 S.W.3d 549, app. at 573-74 (Tenn. 2004)).

Here, however, the complicated procedural background makes it impossible to accurately divide those claims presented by Defendant when he was represented by counsel from those that were presented when he was not. For example, the State asserts that it "is unclear" whether claims raised only in Defendant's pro se motion for new trial have been preserved because Mr. Stegall also filed a motion for new trial on his behalf. However, at the hearing on the motion for new trial, Defendant asked the trial court to strike the motion filed by Mr. Stegall and to consider only his pro se motion. As the trial court observed, by the time of the hearing on Defendant's pro se motion to recuse, Defendant had asked to represent himself in this case *and* to have Mr. Stegall "to serve as elbow or advisory counsel." Defendant had also told the court he had changed his mind and "wanted Mr. Stegall to handle" the proceedings. Then Defendant had changed his mind "again" and asked "to proceed pro se." As early as February 2018, the trial court had determined in the pending post-conviction matter that Defendant would be permitted to proceed pro se.[15]

---

[15] No transcript of this hearing appears in the record on appeal, but both the hearing and the order are repeatedly referenced by the trial court, and Defendant does not disagree with the trial court's summary.

Throughout this time, Defendant continued to file pro se pleadings. Further, Defendant's three cases traveled together through the system, many of the pleadings bear all three case numbers, and all three cases were discussed at most of the pretrial proceedings. Finally, the trial court considered the claims raised by both Defendant and his counsel when making its rulings. We agree with the State that, given the procedural history in this case, it is not possible to say with certainty which of Defendant's pro se claims was raised at a time when he was represented by counsel. Consequently, we will conduct plenary review of the issues presented in this appeal.

## II. Sufficiency of the Evidence

Defendant challenges the sufficiency of the convicting evidence, arguing that "the question of consent in this matter looms large." The State contends that the evidence was sufficient. We agree with the State.

Initially, in his brief, Defendant refers repeatedly to the absence of an affidavit of complaint and argues that Lt. McMinn "omitted material information" in his affidavit of complaint. As the trial court attempted to explain to Defendant many times, and as we have already indicated, there was no affidavit of complaint in this case because the prosecution was commenced by indictment rather than by arrest warrant. *See* Tenn. Code Ann. § 40-2-104. Accordingly, the Shelby County Grand Jury made the determination that probable cause existed to charge Defendant with the aggravated rape of the victim, and that determination was not made based upon an affidavit of complaint presented by Lt. McMinn. Furthermore, any claim regarding the sufficiency of an affidavit of complaint was foreclosed by the return of the indictment because the law is well-settled that a valid indictment cures any defect in the underlying arrest warrant. *See State v. Campbell*, 641 S.W.2d 890, 893 (Tenn. 1982). Finally, the presence or absence of an affidavit of complaint would have no impact upon the sufficiency of the evidence presented at trial.

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State*

*v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The jury, as the trier of fact, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither re-weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

As charged in the indictment and at the time of the 2005 offense, "[a]ggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim" when "[t]he defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2) (2005). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(2) (2005). "'Sexual penetration' means," as is pertinent here, "sexual intercourse . . . anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required [.]" Tenn. Code Ann. § 39-13-501(7) (2005).

The evidence adduced at trial, viewed in the light most favorable to the State, establishes that after she gave Defendant a ride home, the victim went into the abandoned house where Defendant was apparently living. Both smoked crack, and Defendant drank alcohol and ingested marijuana. Defendant then held the victim down, took her keys, and raped her both vaginally and anally against her will. Photographs and the testimony of Ms. Pinson established that the victim suffered "scattered bruises" on her body and the victim said Defendant "pulled her hair out in clumps," satisfying the element of bodily injury. Contrary to Defendant's assertion on appeal, the question of consent does not "loom[] large over this matter." Indeed, the evidence contains no evidence that the victim consented to sex with Defendant. When asked directly, the victim vehemently denied ever having a consensual sexual relationship with Defendant or having agreed to have sex with Defendant in exchange for crack. Many of the "facts" asserted by Defendant in his brief were never introduced at trial. The evidence was sufficient to support Defendant's conviction of aggravated rape.

## III. Pre-Indictment Delay

Defendant asserts that the trial court erred by refusing to dismiss the case based on the more than eleven-year delay between the offense and the indictment, arguing that the delay violated his right to due process under both the state and federal constitutions. Defendant also complains that the trial court should have dismissed the indictment based on what he claims was an illegal pretrial detention. The State contends that the trial court did not err because Defendant failed to establish that the State used the delay to gain a tactical advantage or that he suffered actual prejudice from the delay.

Within months of his indictment, Defendant moved the trial court to dismiss the indictment due to pre-indictment delay, arguing that the lengthy delay deprived him of due process. The State accepted responsibility for delay but argued that Defendant was not entitled to relief because he could not show that the State used the delay to gain a tactical advantage and could not establish any actual prejudice flowing from the delay.

Defendant presented no proof at the January 18, 2022 hearing on the motions to dismiss.[16] Defendant argued that the evidence had "become stale, has become unavailable," that it was no longer possible to verify "inconsistencies in witness statements," and that it was possible "that video may have been . . . available at the time, and it's long gone at this point." Defendant did not specify what evidence had become "stale" or how that staleness might impact his ability to receive a fair trial. He also did not point to any inconsistency in "witness statements" that needed to be addressed. Indeed, there were no witnesses to the offense other than the victim and Defendant. Defendant was provided with the victim's previous statements to the police, which he used to cross-examine her at trial. Defendant did not specify from whom he would have obtained surveillance video or what relevance that video could have had to the aggravated rape charge, which did not occur within the view of any surveillance camera.

The State argued that Defendant's claims were "pure speculation." The State told the trial court that the reason for the delay between the offense and the indictment was "the rape kit backlog" in Shelby County. The State explained that the sexual assault kit collected in this case in 2005 "was sent off years later and tested, and the DNA matched"

---

[16] At the hearing, the trial court accepted the pro se motions previously filed by Defendant and noted for the record that it was also considering those as well as the handwritten motions. Defendant asked that Mr. Stegall be permitted to argue the motions, and the trial court agreed.

Defendant.[17]  Although the victim had identified her rapist as "Tony" and provided an address for the offense, the police had no other information and "lost contact with the victim."  When the DNA profile obtained from the testing of the victim's sexual assault kit matched Defendant, the State reopened the case.

At the conclusion of the hearing, the trial court concluded that although there was delay in presenting the cases to the grand jury, "there is absolutely nothing on the record that shows that [Defendant] has been actually prejudiced" or that the State delayed the case to gain a tactical advantage.  In its written order, the trial court lamented the failure to timely test the sexual assault kits, calling it "an unconscionable abdication of governmental entities to provide resources" but found that the delay was not to gain a tactical advantage, and that Defendant was not entitled to relief.

*A. Due Process*

"Due process principles provide protection from an unreasonable delay between the commission of the crime and the commencement of adversarial proceedings."  *State v. Gilley*, 297 S.W.3d 739, 754 (Tenn. Crim. App. 2008) (citing *State v. Gray,* 917 S.W.2d 668, 673 (Tenn. 1996)); *see also State v. Dykes*, 803 S.W.2d 250, 255 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).  In *Gray*, the Tennessee Supreme court confirmed that "an untimely prosecution may be subject to dismissal upon Fifth and Fourteenth Amendment due process grounds and under Article I, §§ 8 and 9, of the Tennessee Constitution due process grounds even though in the interim the defendant was neither formally accused, restrained, nor incarcerated for the offense."  In *Dykes*, this court, relying upon *United States v. Marion*, 404 U.S. 307 (1971), ruled that to obtain relief based on pre-indictment delay, "the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused."  *Dykes,* 803 S.W.2d at 256 (citing *United States v. Marion,* 404 U.S. 307,

---

[17] The notorious backlog of untested sexual assault kits in Memphis was "widely publicized" and resulted in the reopening of several cold cases.  *See State v. Potts*, No. W2021-01508-CCA-R3-CD, 2023 WL 1978899, at *12 (Tenn. Crim. App. Feb. 14, 2023), *perm. app. denied* (Tenn. May 15, 2023) (first citing *State v. Jackson*, No. W2019-01883-CCA-R3-CD, 2021 WL 1157025, at *2 (Tenn. Crim. App. Mar. 25, 2021); and then *State v. Lindsey*, No. W2018-01987-CCA-R3-CD, 2020 WL 774047, at *3 (Tenn. Crim App. Feb. 14, 2020)); *see also State v. Stafford*, No. W2024-00637-CCA-R3-CD, 2025 WL 399856, at *4 (Tenn. Crim. App. Feb. 4, 2025) (case was reopened following the same process employed in this case); *State v. Tolliver*, No. W2021-01386-CCA-R3-CD, 2023 WL 2673152, at *8 (Tenn. Crim. App. Mar. 29, 2023), *perm. app. denied* (Tenn. Aug. 8, 2023) (same).

324 (1971)); *see also State v. Utley*, 956 S.W.2d 489, 495 (Tenn. 1997) (reiterating that "in other cases involving a pre-arrest delay, the due process inquiry continues to be guided by *Marion*"); *Halquist v. State*, 489 S.W.2d 88, 93 (Tenn. Crim. App. 1972), *overruled on other grounds by State v. Jones*, 598 S.W.2d 209, 216-17 (Tenn. 1980) (observing that "an unreasonable delay between the commission of the offense and the arrest may violate the defendant's constitutional rights if the delay results in prejudice to him or was part of a deliberate, purposeful and oppressive design for delay") (citations omitted). Importantly, prejudice "cannot be presumed and instead must be substantiated by the defendant with evidence in the record," and the record must also contain proof of "the State's use of the delay to gain tactical advantage." *Utley*, 956 S.W.2d at 495.

Without question, there was a substantial delay between the offense, which was committed in April 2005, and the indictment, which was returned in July 2016. The record does not, however, contain any evidence of actual prejudice to Defendant. When considering whether a delay has deprived an accused of due process, "the most critical [factor] is the prejudice to the accused." *Gilley*, 297 S.W.3d at 755-56 (first quoting *Jones v. Greene,* 946 S.W.2d 817, 826 (Tenn. Ct. App. 1996); and then citing *State v. Carico,* 968 S.W.2d 280, 285 (Tenn. 1998) ("The third factor, and the most important though not determinative in every case, is prejudice to the accused."); and then *State v. Webb,* No. 02C01-9512-CC-00383, 1997 WL 80971 (Tenn. Crim. App. Feb. 27, 1997)).

Defendant alleged that he had suffered actual prejudice because he had been unable to locate the victim's friend Marlo, who, he claims, could have testified that he and the victim "had an on and off sexual relationship" and could have reported any conversation between Defendant and the victim while both were at Marlo's house. Additionally, he claimed that, had the State timely prosecuted the case, he could have obtained surveillance video from Walmart and Citgo to contradict the victim's claim that Defendant forced her to write checks. Because Defendant presented no proof, these claims are wholly speculative. The mere possibility of prejudice is insufficient to warrant relief. *Marion*, 404 U.S. at 326 (stating that the possibilities of prejudice was "not enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment").

Moreover, even if Marlo could have testified that the victim left voluntarily with Defendant, it would not have changed the outcome of the trial because the victim acknowledged that she agreed to give Defendant a ride. Similarly, any testimony that Marlo could have provided about the victim's mental state would have been cumulative to the victim's own testimony that she had been smoking crack and was not in her "right state of mind" when she left with Defendant. Further, Marlo was not present during the offense,

and any potential testimony about a prior sexual relationship between Defendant and the victim could not have negated the victim's testimony that Defendant violently raped her. Finally, even assuming that surveillance video existed as Defendant claimed, it would have been irrelevant to the charged offense of aggravated rape.

In addition to his failure to show actual prejudice, Defendant has not shown that the State used the delay to gain a tactical advantage. The State accepted responsibility for the delay, observing that it "was part of the rape kit back log," but no evidence suggests that the State intentionally used the delay to gain an advantage in prosecuting Defendant. Instead, the record establishes that as soon as it had the resources to do so, the State sent the sexual assault kit for testing and then acted with all due haste in bringing charges against Defendant after receiving the test results. There is no evidence of "inappropriate conduct by State agents." *Carico*, 968 S.W.2d at 286 (finding no due process violation from pre-indictment delay of seven years when "the delay was not caused by any inappropriate conduct by State agents and the appellant has not shown that his rights were prejudiced by the delay"). Defendant is not entitled to relief on this issue.

## B. Tennessee Rule of Criminal Procedure 48

Defendant also asserts that the trial court should have dismissed the case under the discretionary authority afforded by Tennessee Rule of Criminal Procedure 48. The State asserts that Defendant has waived this issue by failing to support it by citation to appropriate authorities and argument. We agree.

As the appellant, Defendant was required to include within his argument:

(A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and

(B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues)[.]

Tenn. R. App. P. 27(7).  Similarly, Rule 10 of the rules of this court provides that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."  Tenn. Ct. Crim. App. R. 10(b).  Defendant's Rule 48 argument does not satisfy these requirements, and, accordingly, is waived.

Moreover, Defendant is not entitled to relief on this issue because Rule 48 does not apply to the pre-indictment delay in this case.  Rule 48 provides that the trial court "may dismiss an indictment, presentment, information, or complaint if unnecessary delay occurs in . . . presenting to a grand jury a charge *against a defendant who has been held to answer to the trial court*."  Tenn. R. Crim. P. 48 (emphasis added).  In this case, Defendant was not arrested until after the grand jury returned the indictment, and, consequently, had not "been held to answer to the trial court" prior to the indictment.

*C. Remaining Claims*

In his brief, Defendant claims that the trial court should have dismissed his indictment because it was obtained in violation of the Fourth Amendment and Tennessee Rule of Criminal Procedure 5.  He also claims that the trial court's failure to rule on his motion violated his right to due process, but this claim is waived because he failed to support it with argument, citation to authorities, or references to the record.  *See* Tenn. Ct. Crim. App. R. 10(b).  The State construes Defendant's argument as a challenge to his pretrial detention and argues that he is not entitled to relief.  We agree with the State.

Defendant's passing reference to the Fourth Amendment is insufficient to raise a constitutional issue on appeal and is waived.  *See id.*  Furthermore, Defendant's Rule 5 argument is grounded in his fundamental misunderstanding of Tennessee criminal procedure.  He complains that Lt. McMinn "omitted material information" and "modified a probable cause document."  As the trial court explained to Defendant, and we addressed above in this opinion, the prosecution in this case did not commence with an arrest warrant supported by an affidavit of complaint.  Instead, Defendant was arrested on the charge in this case after the grand jury returned the indictment.  As is relevant here, "[a] prosecution is commenced . . . by finding an indictment or presentment," *or* "the issuing of a warrant."  Tenn. Code Ann. § 40-2-104.  Tennessee Rule of Criminal Procedure 5 provides that "person arrested--*except upon a capias pursuant to an indictment or presentment*--shall be taken without unnecessary delay before the nearest appropriate magistrate."  Tenn. R. Crim. P. 5(a)(1) (emphasis added).  Following the indictment in this case, a valid capias

- 16 -

was issued pursuant to Tennessee Rule of Criminal Procedure 9[18] so that Defendant could be brought to answer for the charge in this case. Thus, there is no merit to Defendant's claim.

IV. Post-Indictment Delay/Speedy Trial

Defendant asserts that the nearly seven-year delay between the July 2016 indictment and the June 2023 trial violated his right to a speedy trial as guaranteed by both the state and federal constitutions. The State asserts that Defendant is not entitled to relief because he was responsible for the delay and because he cannot show prejudice.

The right to a speedy trial, which is constitutionally and statutorily guaranteed, *see* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also* Tenn. Code Ann. § 40-14-101, "attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." *State v. Berry,* 141 S.W.3d 549, app. at 568 (Tenn. 2004) (quoting *State v. Vickers,* 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997)). "The speedy-trial right is 'amorphous,' 'slippery,' and 'necessarily relative'" as well as "consistent with delays and depend[ent] upon circumstances." *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (citing *Barker v. Wingo*, 407 U.S. 514, 522 (1972)). Accordingly, the Supreme Court has adopted "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* (citing *Barker*, 407 U.S. at 529).

To determine whether the right to a speedy trial has been compromised, a court considers the following factors: (1) the length of the delay, (2) the reason for the delay, (3) the assertion of the right to speedy trial, and (4) any prejudice to the defendant occasioned by the delay. *See Barker*, 407 U.S. at 530; *see also State v. Bishop,* 493 S.W.2d 81, 83-85 (Tenn. 1973). Of these factors, the most important is prejudice, and the critical inquiry concerning prejudice "is the impairment of the ability to prepare a defense." *State v. Vance,* 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994); *see also Berry*, 141 S.W.3d 549, app. at 568 (citing *State v. Baker*, 614 S.W.2d 352, 356 (Tenn. 1981)).

"[A] speedy trial violation claim is a mixed question of law and fact." *State v. Moon*, 644 S.W.3d 72, 78 (Tenn. 2022). Consequently, we review de novo the trial court's

---

[18] *See* Tenn. R. Crim. P. 9 (providing for issuance of capias following indictment and establishing requirements for contents of the capias).

application of the law to the facts but "give deference to the trial court's findings of fact unless the evidence preponderates otherwise." *Id.*

## A. *Length of Delay*

To activate the four-part inquiry, the interval between accusation and trial must have "crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Doggett v. United States,* 505 U.S. 647, 651-52 (1992) (quoting *Barker,* 407 U.S. at 530-31). "Generally, post-accusation delay must approach one year to trigger a speedy trial inquiry," and although "[t]he reasonableness of the length of the delay depends upon the complexity and nature of the case, . . . the presumption that delay has prejudiced the accused intensifies over time." *State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001) (first citing *Doggett*, 505 U.S. at 652; and then *Utley*, 956 S.W.2d at 494; and then *State v. Wood*, 924 S.W.2d 342, 346 (1996)). The seven-year delay in this case is sufficient to trigger a speedy trial inquiry in this case.

## B. *Reason for Delay*

Delay "generally falls into one of four categories," including:

(1) intentional delay to gain a tactical advantage or to harass the defendant; (2) bureaucratic indifference or negligence, including overcrowded dockets or lack of diligence; (3) delay necessary to the fair and effective prosecution of the case, such as locating a missing witness; and (4) delay caused, or acquiesced, in by the defense, including good faith attempts to plea-bargain or repeated defense requests for continuances.

*Simmons*, 54 S.W.3d at 759 (first citing *Barker*, 407 U.S. at 531; and then *Wood*, 924 S.W.2d at 346-47).

The trial court concluded that Defendant had "not come to trial because of his actions, one hundred percent (100%) because of his actions." The court observed that Defendant had repeatedly asked to change attorneys and had waffled on whether he wanted to represent himself or not. The trial court also explained that there had been issues with getting Defendant transferred to Memphis for court appearances and that the Shelby County Jail had ignored orders that Defendant remain in Shelby County rather than be

returned to the custody of the Tennessee Department of Correction ("TDOC") until all his pending cases were concluded.[19] Furthermore, beginning on March 13, 2020, all cases were suspended by the Tennessee Supreme Court because of the COVID-19 pandemic.[20] The trial court noted that even after the supreme court lifted its blanket restriction and allowed each judicial district to make its own decisions, Shelby County elected to suspend jury trials until at least January 2023 given the extremely high levels of COVID-19 infections in the county. Perhaps most importantly, however, the trial court found that Defendant had "insisted year after year after year that he was not ready to hear his cases."

We agree with the trial court that, aside from the delay occasioned by the COVID-19 pandemic, the post-accusation delay in this case is attributable primarily to Defendant. Defendant's chicanery about whether he would proceed pro se or accept appointed counsel and his repeated requests for a new attorney any time appointed counsel refused to obey his wishes caused the bulk of delay in this case. Defendant caused further delay by filing a completely meritless motion to recuse the trial judge. Finally, although Defendant filed myriad motions to dismiss based upon the same grounds, when the time for hearing those motions came, he claimed to be unprepared to proceed. When he was in court, Defendant was argumentative and uncooperative. Any "delay caused by the defense weighs against the defendant: '[I]f delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine.'" *Brillon*, 556 U.S. at 90 (first quoting *Barker*, 407 U.S. at 529; and then citing *United States v. Loud Hawk,* 474 U.S. 302, 316 (1986)). This factor weighs heavily against Defendant.

## C. Assertion of the Right

Within months of his indictment, Defendant filed a pro se a handwritten motion demanding a speedy trial while he was represented by Ms. Timmerman. However, at the January 18, 2022 hearing on Defendant's many motions to dismiss, the trial court accepted the pro se motions previously filed by Defendant and noted for the record that it was considering those, including the handwritten motions, as well as the motions filed by

---

[19] Defendant had apparently been committed to TDOC following his conviction in case number 08-07876.

[20] On March 13, 2020, the Tennessee Supreme Court suspended in-person court proceedings, which included jury trials, subject to certain exceptions not relevant here. *See In re* **COVID-19** *Pandemic*, No. ADM2020-00428 (Tenn. Mar. 13, 2020) (Order).

appointed counsel. Under these circumstances, we conclude that Defendant demanded a speedy trial, and this factor weighs in his favor.

## D. Prejudice to Defendant

The Supreme Court has observed that "unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including 'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." *Doggett*, 505 U.S. at 654 (first quoting *Barker,* 407 U.S. at 532 (alteration in *Doggett*); and then citing *Smith v. Hooey,* 393 U.S. 374, 377-379 (1969); and then *United States v. Ewell,* 383 U.S. 116, 120 (1966)). "Of these forms of prejudice, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Doggett*, 505 U.S. at 654 (quoting *Barker,* 407 U.S. at 532).

We have already addressed Defendant's claim that his pretrial detention was "illegal" because the "affidavit of complaint" was invalid and deemed it without merit. Moreover, although Defendant was incarcerated for the entire seven years prior to the trial, Defendant was not held solely because of the charge in this case. Instead, Defendant was, at least part of the time, serving the twenty-year sentence imposed in case number 08-0786. To be sure, "anxiety and concern" could have been an issue for Defendant, but he presented no evidence to support a conclusion that his anxiety and concern went beyond that typical for any person facing serious criminal charges. Most importantly, Defendant failed to show that the seven-year delay impaired his ability to present a defense. Defendant presented no proof that witness memories had faded or that he had lost exculpatory evidence. The theory of the defense was that the victim had consented to sex with Defendant. Defendant offered no evidence that the delay deprived him of the ability to present that defense. This factor weighs against Defendant.

Here, the facts do not preponderate against the findings of the trial court. Upon our de novo review of the trial court's application of the law to the facts, we find no error. Two of the four *Barker* factors weigh heavily against Defendant, and, accordingly, the record does not establish a speedy trial violation.

## V. Recusal

Defendant asserts that the trial court erred by refusing to recuse himself and complains about the trial court's handling of his motions asking the trial judge to recuse himself. The State asserts that Defendant is not entitled to relief on this issue.

Defendant filed the first motion to recuse on July 10, 2019, and the trial court held a hearing on Defendant's motions two days later. Defendant presented no evidence at the hearing. He argued that the trial judge had "a personal bias or prejudice against me or in favor of the prosecuting attorney" that had existed "ever since Chris Craft forwarded this case to you." The trial judge explained that Judge Craft did not "forward" the case to him and that, instead, all of Defendant's cases had been reassigned to him after Judge Craft had granted Defendant's motion asking Judge Craft to recuse himself in the post-conviction case. The trial judge assured Defendant that, given his heavy case load, he had "no personal interest in your case or any of the other cases in this courtroom." The judge added that he knew "nothing about your case other than what I've read and I've ruled on" and that he knew "nothing about" Defendant other than that he had "a hard time getting along with lawyers, and that you have managed to drag this case out in this [c]ourt now for two and a half years and we're making no progress." When Defendant argued that the trial judge's failure to hear the motions to dismiss was evidence of his bias, the trial judge reminded him that the motions were set to be heard that day. Defendant responded that he was "not prepared" to have a hearing on the motions to dismiss.

At the conclusion of the hearing, the trial court found that the motion was untimely and that, in any event, Defendant had "not stated any legal grounds as to why this [c]ourt should in fact recuse itself." The court also found that the motion to recuse had been "filed in bad faith." In its written order denying relief, the court ruled that Defendant's motion was "unverified, wholly speculative, and unsupported by any factual proof." The court concluded that the motion was "and interposed merely for delay; ergo, for good cause, the [c]ourt shall continue to preside over his pending cases."

In January and February 2023, Defendant filed second and third motions seeking recusal of the trial judge. The State asserts that these motions were not "filed" in the trial court. The January motion included in the supplemental record filed in this court bears a file stamp hand dated "1-23-23" and signed by the court clerk.[21] The affidavit of

---

[21] At the hearing on Defendant's motion for new trial, it appeared that the trial judge was not aware of either of these motions but allowed the pro se Defendant to exhibit copies of the motions to the hearing.

- 21 -

Defendant, which is not notarized, appended to this motion as well as the Certificate of Service are dated July 5, 2019. A "Sworn Affidavit of Complaint" also appended to the January motion indicates that it was signed and notarized on July 3, 2019. These documents are identical to those appended to the Motion to Recuse filed in July 2019, and the motion itself is essentially identical to the motion filed in July 2019. In contrast to the January motion, the February motion was marked as "received" rather than "filed" on February 13, 2023. Notably, the February motion bears a Certificate of Service dated January 23, 2023.

The January motion alleged as grounds for recusal, as are relevant to this case,[22] that the trial judge had "vouched for the credibility of ineffective Counsel's [sic]," that he had attempted to "bar" Defendant from presenting evidence at the hearing on his motion to dismiss, that he had attempted to "bar" Defendant from challenging the indictment based upon perceived errors in the makeup of the grand jury, that he had failed to rule on various of Defendant's motions, that he had forced Defendant to proceed with ineffective counsel, and that he had "a personal bias or prejudice against" Defendant "or in favor of the prosecuting District Attorney." The February motion added claims that the trial judge had forced him to represent himself "with ineffective counsel [as] co-counsel," that he had "allowed an Affidavit of Complaint" to "be submitted without being Sworn to before a proper authority," that he had failed to rule on Defendant's motions to dismiss for pre- and post-indictment delay, and that he had failed to rule on Defendant's motions to dismiss his appointed attorneys.

On appeal, Defendant argues that the trial court erred by denying the July 2019 motion to recuse and by failing to rule on the January and February 2023 motions to recuse. The State contends that Defendant failed to comply with the requirements for filing a motion to recuse and that, in any event, the trial judge did not err by refusing to recuse himself.

As an initial matter, we observe that Defendant has already appealed the trial court's refusal to grant his February 2023 motion to recuse. *See Thomas 10B Order.* In May 2023, Defendant filed in this court a pleading styled "Motion for Tenn. Sup. Ct. R. 10B Accelerated Interlocutory Appeal as of Right from the Denial of Motion for Recuser [sic] or Disqualification of Trial Judge," listing in the caption only case number 16-0600. Despite listing only case number 16-600, the pleading refers to the motion to recuse filed

---

[22] This pleading, like most of those filed by Defendant, bears all three case numbers and contains facts and allegations about each of his cases.

in February 2023, which bore the numbers of all three cases then-pending against Defendant. The pleading to this court refers to facts and proceedings from all three of those cases. "A court may take judicial notice whether requested or not." Tenn. R. Evid. 201(c). "Facts relating to the operation of the courts, matters occurring within the immediate trial or appeal, or developments in a prior trial or prior proceedings all have been subject to judicial notice." *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009) (citations omitted). "[T]hose matters pertaining to the records of a court are subject to judicial notice by the judge of that court," *id.* at 870 (citing Robert Banks, Jr. & Elizabeth T. Collins, *Judicial Notice in Tennessee*, 21 Mem. St. U. L. Rev. 431 (1991)), and "[i]f the records are of the court itself, they may be judicially noticed and need not be proved," *see id.* (citing 2A Charles A. Wright, *Federal Practice and Procedure: Criminal* § 441, at 254 (3d ed. 2000) (alteration in *Lawson*).

As he did in the motions to recuse filed in the trial court, Defendant complained about the rulings made by the trial court on his motions, the trial court's perceived failure to rule on certain motions, and the court's "forcing" him to proceed pro se with ineffective advisory counsel. Defendant argued that recusal was warranted because the trial judge "has a personal bias and prejudice concerning" Defendant, "has a special interest in the outcome," "is using a prosecutor's mentality," and is "condoning official misconduct." In our order denying review, this court observed that it was "unclear" to which of Defendant's pending cases "the instant recusal relates." *See Thomas 10 B Order*, at 2. We concluded that, in any event, Defendant's petition for review was incomplete, and denied review. *See id.*; *see also* Tenn. Sup. Ct. R. 10B § 2.05 (providing for summary dismissal of petition for recusal appeal).

Tennessee Supreme Court Rule 10B provides that a motion to recuse must be filed in writing "promptly after a party learns or reasonably should have learned of the facts establishing the basis for recusal" and must be "supported by an affidavit under oath or a declaration under penalty of perjury on personal knowledge and by other appropriate materials." Tenn. Sup. Ct. R. 10B § 1.01. "A party who is represented by counsel is not permitted to file a pro se motion under this rule." *Id*. Moreover, "[a]ny subsequent motion under this section filed in the same case must state, with specificity, *substantially different factual and legal grounds* than those relied upon in support of a prior motion filed under this section," or the motion will "be deemed repetitive and summarily denied." *Id.* If the trial judge determines that a subsequent motion fails to identify "substantially different" grounds for relief, "[t]he judge need not require a response to the motion, conduct a hearing on it, or provide any other written explanation for denying the motion." *Id.* § 1.03. We review the denial of a motion to recuse de novo. *See State v. Hardison*, 680 S.W.3d 282, 305-06 (Tenn. Crim. App. 2023) (citing Tenn. Sup. Ct. R. 10B § 2.01).

As for Defendant's February motion, we observe that, based upon the record before us, this motion was never actually filed in the trial court and was subject to summary dismissal on this basis. *See* Tenn. Sup. Ct. R. 10B § 1.01. Moreover, because the motion was not properly filed, the trial court cannot be faulted for failing to hear the motion. Finally, based upon the content of the motion itself, it was not submitted "promptly" after Defendant purportedly "learned of the facts establishing the basis for recusal" given that the motion references actions taken by the trial court years before the motion was filed. *See id.* Defendant is not entitled to any relief based on the February motion.

As for the January motion, because it was identical in form and substance to the previously denied July 2019 motion, it was subject to summary dismissal because it was repetitive. *See id.* Thus, the trial court did not err by failing to conduct a hearing on the motion or by providing a written order denying the motion. *See* Tenn. Sup. Ct. R. 10B § 1.03.

As for the July 2019 motion, we conclude that the trial court did not err by denying the motion to recuse because Defendant failed to present any evidence in support of his claim that the trial court was biased or prejudiced. "The terms 'bias' and 'prejudice' generally refer to 'a state of mind or attitude that works to predispose a judge for or against a party;' however, '[n]ot every bias, partiality, or prejudice merits recusal.'" *Elseroad v. Cook*, 553 S.W.3d 460, 466 (Tenn. Ct. App. 2018) (citing *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994)). Importantly, any "claim of bias or prejudice must be based on facts, not speculation or innuendo." *Runyon v. Runyon*, No. W2013-02651-COA-T10B, 2014 WL 1285729, at *9 (Tenn. Ct. App. Mar. 31, 2014). Furthermore, the trial court properly denied the motion because it was based primarily on the court's previous adverse rulings against Defendant. "A trial judge's adverse rulings are not usually sufficient to establish bias," even if the rulings are "erroneous, numerous and continuous." *State v. Cannon*, 254 S.W.3d 287, 308 (Tenn. 2008) (citing *Alley*, 882 S.W.2d at 821). Defendant is not entitled to any relief based upon the trial court's denial of his July 2019 motion to recuse.

## VI. Right to Counsel

Defendant asserts that the trial court deprived him of the constitutional right to counsel, stating, in conclusory fashion, that he is entitled to "relief of the argument and granted of a new trial from the above violation at which he is guaranteed and secured to him." The State contends that Defendant has waived our consideration of this issue by failing to present an adequate record for review, noting that the record does not contain the

February 2018 hearings on Defendant's request to proceed pro se or the trial court's written order granting the same. Indeed, Defendant admitted that "there were multiple parts of this procedure that the trial court over-looked and not included in the record on appeal." Although we agree with the State that inclusion of the February 2018 materials might have assisted in our review, we conclude that the record is sufficient for plenary review. This is particularly true given that the February 2018 proceedings were apparently part of Defendant's pending post-conviction proceeding and not specifically related to this case.[23]

Defendant filed his first pro se pleading in January 2017 and continued to file pro se pleadings throughout the pendency of this case, even at times when he was, at least on the record, represented by counsel. As indicated, the trial court appointed and removed Ms. Timmerman before appointing Mr. Stegall and then, following a hearing, permitted Defendant to proceed pro se.

At the October 2019 hearing on Defendant's July 2019 motion to recuse, Defendant insisted on proceeding pro se, and the trial court observed that Defendant had equivocated in each of his three pending cases on the issue of whether he wanted to represent himself. The court observed that in February 2018, it had held a "lengthy" hearing on the issue in Defendant's pending post-conviction proceeding and that at the conclusion of that hearing, the court determined that Defendant had "knowingly, intelligently, and voluntarily waived your right to counsel." Defendant agreed with the trial court's recollection. When Defendant maintained that he wanted represent himself in this case, the trial court questioned Defendant on this issue.

Defendant indicated that he had a tenth-grade education and that he had not studied law outside of the research he had conducted while in custody on his pending cases. He said that he had read the Tennessee Rules of Evidence and that he knew "enough" about the Tennessee Rules of Criminal Procedure to feel comfortable representing himself. The court warned Defendant that "it is not a good idea to represent yourself on a case" that "carries 15 to 60 years in prison." Defendant said that he understood and that he was aware that any sentence he received would require 100 percent service.[24] The court also warned Defendant that he would be held to the same standard as any attorney practicing before the court, and Defendant indicated his understanding. When the court asked Defendant whether, having been so warned, he still wanted to represent himself, Defendant replied,

---

[23] As we have noted, however, the tendency of the trial court and Defendant to address all three pending cases at *every* hearing and in *every* pleading in this case has led to a great deal of confusion.

[24] *See* Tenn. Code Ann. § 40-35-501(i)(1), (2)(F) (2005).

"[I]f you forcing Mr. Stegall to represent me, yes, sir, I'm representing myself because you forcing an ineffective counsel to represent me." The court replied that it was "not forcing anybody to represent" Defendant but that it would "not appoint a third lawyer on these cases." Defendant alleged that he and Mr. Stegall had "a serious conflict of interest" because Mr. Stegall had advised him not to present certain evidence. In response, the court again refused to appoint a different attorney to assist Defendant. The court found that Defendant had made "a knowing and voluntary decision to waive your rights to counsel." In our view, the record does not establish that the trial court violated Defendant's right to counsel and instead indicates that Defendant both explicitly and implicitly waived his right to counsel.

Although every individual accused of a crime is guaranteed the right to counsel at all critical stages of the criminal proceeding, s*ee* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; an indigent defendant is not guaranteed the right to "counsel of choice, special rapport with counsel, confidence in counsel, or even a meaningful relationship with counsel" *Mobley v. State*, 397 S.W.3d 70, 93 (Tenn. 2013) (first citing *State v. Carruthers,* 35 S.W.3d 516, 546 (Tenn. 2000); and then *Morris v. Slappy,* 461 U.S. 1, 13-14 (1983)). "The essential aim is to guarantee an effective advocate, not counsel preferred by the defendant." *Id.* (citing *Carruthers*, 35 S.W.3d at 546). "Grounds upon which a trial court may order substitution of counsel" appointed to represent an indigent defendant "include when counsel's representation is ineffective, when the defendant and counsel have become embroiled in an irreconcilable conflict, or when there has been a complete breakdown in communication between counsel and the defendant." *Id.* (citing *State v. Gilmore*, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991)).

"[T]he wrongful deprivation of a criminal defendant's right to counsel is a structural error which so contaminates the proceeding that reversal is mandated." *State v. Holmes*, 302 S.W.3d 831, 838 (Tenn. 2010). Similarly, the denial of "the exercise of the right to self-representation is a structural constitutional error not amenable to harmless error review and requires automatic reversal when it occurs." *State v. Hester*, 324 S.W.3d 1, 30 (Tenn. 2010) (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)).

In our view, the trial court did not deprive Defendant of his Sixth Amendment right to counsel by refusing to remove Mr. Stegall and appoint another attorney. Defendant presented no grounds upon which the trial court should have dismissed Mr. Stegall and appointed a third attorney to represent Defendant. The record contains no evidence that Mr. Stegall had rendered ineffective assistance. Instead, the record reveals that Defendant himself stood in the way of Mr. Stegall's providing him with assistance. Further, despite Defendant's protestations to the contrary, the record contains no evidence that he and Mr.

Stegall were "embroiled in an irreconcilable conflict" or that there had "been a complete breakdown in communication" between the two. Instead, the record shows that Defendant was dissatisfied with Mr. Stegall's legal advice. Dissatisfaction does not a conflict make. *See Mobley*, 397 S.W.3d at 93 ("A defendant's refusal to cooperate with counsel does not necessarily justify substitution of counsel." (citing *State v. McClennon,* 669 S.W.2d 705, 707 (Tenn. Crim. App. 1984)).

It is also our view that the record does not demonstrate a deprivation of Defendant's Sixth Amendment right to counsel but instead establishes that Defendant knowingly and voluntarily waived his right to counsel and elected to represent himself. "The determination of whether a defendant has exercised his or her right of self-representation and has concurrently waived his or her right to counsel is a mixed question of law and fact," that we review "de novo, accompanied by a presumption that the trial court's findings of fact are correct." *Hester*, 324 S.W.3d at 29-30 (first citing *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002); and then *United States v. Robinson*, 913 F.2d 712, 714 (9th Cir. 1990); and then *Spencer v. Ault*, 941 F. Supp. 832, 851 (N.D. Iowa 1996); *State v. Jordan*, 984 A.2d 1160, 1166 (Conn. App. 2009); and then 1 Kevin F. O'Malley et al., *Federal Jury Practice & Instructions* § 5:6 (6th ed. 2009); and then *Holmes*, 302 S.W.3d at 837).

To activate the right of self-representation, the defendant must: (1) timely assert the right to proceed pro se; (2) clearly and unequivocally exercise the right; and (3) knowingly and intelligently waive his or her right to assistance of counsel. *Id.* at 30-31. Tennessee Rule of Criminal Procedure 44 provides that "[b]efore accepting a waiver of counsel, the court shall:

> (A) advise the accused in open court of the right to the aid of counsel at every stage of the proceedings; and
>
> (B) determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters.

Tenn. R. Crim. P. 44(b)(1). To facilitate the determination whether the defendant has made "a competent and intelligent waiver," this court has recommended that trial courts rely on the questions set forth "in 1 Bench Book for United States District Judges." *State v. Herrod*, 754 S.W.2d 627, 630 (Tenn. Crim. App. 1988) (citing *United States v. McDowell*, 814 F.2d 245, 251-52 (6th Cir. 1987)).

The trial court bears "the serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver by the accused." *Von Moltke v. Gillies*, 332 U.S. 708, 723 (1948) (citation omitted).

> To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances.

*Id.* at 24 (citation omitted). Using the *Bench Book* guidelines as a template, we examine the proceedings in this case.

The trial court's inquiry, which followed the guidelines, was the kind of "intensive hearing . . . required in order to ascertain that [Defendant] knowingly and intelligently waived his right to counsel and that [Defendant] knew and fully understood the consequences of his decision to represent himself." *Lovin*, 286 S.W.3d at 28. The record supports the trial court's conclusion that Defendant had knowingly, voluntarily, and intelligently waived his right to counsel and elected to represent himself in this case. To be sure, Defendant also argued that he wanted a new attorney, but, as the trial court found, Defendant had failed to present sufficient grounds for the removal of Mr. Stegall. As indicated above, the record supports this conclusion. When the trial court did appoint a different attorney to represent Defendant in this appeal, Defendant rejected this attorney.

Moreover, Defendant's contentious conduct was sufficient, in our view, to result in an implicit waiver of the right to counsel. Indeed, Defendant's "entire course of conduct demonstrates beyond any doubt that he fully intended to control the proceedings and to fire and/or intimidate and/or refuse to cooperate with any lawyer—or any judge, for that matter—that did not obey his every command." *State v. Parsons*, 437 S.W.3d 457, 487 (Tenn. Crim. App. 2011). Under these circumstances, we conclude that Defendant

knowingly, voluntarily, and intelligently waived his right to counsel *and* that he implicitly waived his right to counsel by serially requesting new counsel solely because his previous attorneys refused to obey his commands. The trial court was not obligated to appoint new counsel when Defendant had complained about all his previous attorneys and had plainly expressed his desire to represent himself.

The absence of a written waiver of the right to counsel from the record does not alter our conclusion.[25] No written waiver of the right to counsel appears in the record on appeal, and nothing else in the record suggests that the defendant executed such a waiver in this case that was inadvertently omitted from the appellate record. Rule 44 requires that "[a] waiver of counsel shall be in writing" and that the written waiver must be "in the record." Tenn. R. Crim. P. 44(b)(2)-(3). That being said, the rule does not specify a particular form that the written waiver must follow, *see, e.g.*, *State v. Battles*, No. W1998-00558-CCA-R3-CD, 1999 WL 1525475, at * 8 n. 5 (Tenn. Crim. App. Dec. 30, 1999) (stating that repeated filing of pro se motions "initiated by the defendant" were "sufficient to satisfy the written waiver requirement"), and this court has held that the absence of a written waiver "does not necessarily preclude a constitutionally valid waiver," *State v. Hatch*, No. W2000-01005-CCA-R3-CD, 2001 WL 1268442, at *6 (Tenn. Crim. App. Oct. 19, 2001) (first citing *State v. Goodwin*, 909 S.W.2d 35, 39-40 (Tenn. Crim. App. 1995); and then *State v. Ali*, No. 03C01-9802-CR-00065, 1999 WL 639689, at *3-4 (Tenn. Crim. App. August 24, 1999); and then *Fowler v. State*, No. 03C01-9711-CR-00509, 1999 WL 552938, at *10-11 (Tenn. Crim. App. July 30, 1999)); *see also State v. McClain*, No. W2019-01217-CCA-R3-CD, 2021 WL 3828380, at *15 (Tenn. Crim. App. Aug. 26, 2021); *State v. Black*, No. 02C01-9803-CR-00081, 1999 WL 280810, at *4 (Tenn. Crim. App. May 7, 1999). Under the facts of this case, we conclude that the absence of a written waiver of counsel does not entitle Defendant to any relief.

## VII. Mistrial

Defendant asserts that the trial court erred by denying his motion for mistrial based upon the victim's outburst at the conclusion of her direct examination testimony. The State contends that Defendant is not entitled to relief on this issue.

---

[25] This is particularly true given the overall state of the record in this case. *See State v. Rimmer*, 623 S.W.3d 235, 296-97 (Tenn. 2021) ("As the appellant, it was the Defendant's burden to prepare an adequate record for appellate review." (citing *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993)).

At the conclusion of her direct examination testimony, in response to the State's asking how the rape had affected her, the victim said that she was "angry" and that she had "not had a stable relationship since." She added,

> And I couldn't even tell my family I was coming here today, because my sons would probably come in here and act a fool, which they rightfully should, because you took my life from me. Not only by crack, but you raped me. And I told you no. You're a monster and you -- deserve to be locked up for the rest of your f***ing life. . . . And I hate your guts. I hope you die.

Mr. Stegall promptly objected on behalf of Defendant. The victim then apologized to the trial court, and the court replied, "You don't need to apologize." The court cautioned her that although it could understand her frustration, "during trial, is not an appropriate time for it, okay? But you have an absolute right to tell the jury how you feel, but you can't just call him . . . . names and you can't use profanity, okay?"

In a bench conference, Mr. Stegall informed the court that Defendant was moving for a mistrial based on the outburst. The court denied the request, saying that the victim "was asked how it has affected her life, and she has a right to answer that question." The court noted that the victim's language was inappropriate and that he had admonished her, "[b]ut there's no grounds for a mistrial. This is a young lady that says [']I was raped anally and vaginally,['] and I'm not going to tell a person how they should react to that event." The court also offered to provide a curative instruction, and Mr. Stegall agreed.

The court instructed the jury,

> "Ladies and gentlemen, [the victim] has told you how she feels. She has a right to tell the court how this has affected her  life, how this event has affected her life.
>
> There are some words that she used that are her words. And in a courtroom, maybe not . . . the best words to use. . . . . And I', going to order that you not -- not consider those words of him being a monster, okay? That's inappropriate. . . . I'm going to order you to disregard that word."

"The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v.*

- 30 -

*Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "[T]he granting of a mistrial is a matter resting within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion; 'normally, a mistrial should be declared only if there is a manifest necessity for such action.'" *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009) (quoting *State v. Saylor*, 117 S.W.3d 239, 250-51 (Tenn. 2003)). A manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "When determining whether a mistrial is necessary because inappropriate testimony was presented to the jury, this court considers the following nonexclusive factors: (1) whether the state elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the state's proof." *State v. March*, 494 S.W.3d 52, 78 (Tenn. Crim. App. 2010) (internal quotation omitted).

"Moreover, the burden of establishing the necessity for a mistrial lies with the party seeking it." *State v. Reid*, 164 S.W.3d 286, app. at 342 (Tenn. 2005). "Unless the trial court finds that the prosecutor intended his misconduct to provoke the defendant into requesting a mistrial, the defendant may be retried following the granting of the defendant's motion for a mistrial." *State v. Tucker*, 728 S.W.2d 27, 32 (Tenn. Crim. App. 1986).

We conclude that the trial court properly found there was not a manifest necessity requiring a mistrial. Although we certainly do not condone the victim's language, her outburst was fleeting, and Mr. Stegall's objection ended it. Moreover, the remark was not made in response to any improper questioning by the State, and the State made no attempt to exploit the improper comment. Additionally, the trial court provided a lengthy and forceful curative instruction and admonished the victim in front of the jury against any further outbursts.

## Conclusion

Based upon the foregoing analysis, we affirm the judgment of the trial court.

s/Matthew J. Wilson
_____
MATTHEW J. WILSON, JUDGE